UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
Louisville Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.   317-cv-432-DJH |
| | ) | |
| RUSTY THOMAS, JAMES SODERNA, | ) | |
| THOMAS RADDELL, DAVID GRAVES, | ) | |
| LAURA BUCK, CHRIS KEYS, | ) | |
| JAMES ZASTROW, EVA EDL, | ) | |
| EVA ZASTROW, and DENNIS GREEN, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE
MOTION OF THE UNITED STATES OF AMERICA FOR A
<u>TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION</u>**

The United States of America (the "United States") brings this motion to enforce the

Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C. § 248.  Rusty Thomas,

James Soderna, Thomas Raddell, David Graves, Laura Buck, Chris Keys, James Zastrow, Eva

Edl, Eva Zastrow, and Dennis Green ("Defendants"), by physical obstruction, have intentionally

interfered, and/or attempted to do the same, with persons who sought and/or persons who

provided reproductive health services at the EMW Women's Surgical Center ("EMW") in

Louisville, Kentucky.  Defendants sat in rows against the front doors of EMW on May 13, 2017,

making it impossible to access the patient entrance, until local police arrested Defendants.

Defendant Thomas has proclaimed that this event forms part of a larger campaign to prevent

access for individuals obtaining and providing reproductive health services at EMW.  Absent

timely intervention by the Court, the Defendants are reasonably likely to continue to violate the FACE Act by obstructing the entrance to EMW.  Because the United States is likely to succeed on the merits; Defendants' actions will cause irreparable harm to persons seeking to obtain or provide reproductive health services at EMW absent court intervention; Defendants will not suffer substantial harm should injunctive relief issue; and injunctive relief is in the public interest of promoting access to reproductive health services, public safety and security, the Court should temporarily restrain and preliminarily enjoin the Defendants, and others acting in concert or participation with them, from continuing to engage in activities that violate the FACE Act. Specifically, the Court should prohibit Defendants from: using physical obstruction to intentionally interfere with any person, or attempt to intentionally interfere with any person, because the person was or had been obtaining or providing reproductive health services at EMW; and create a "buffer zone" directly outside EMW's entrance, between EMW property and the curbside patient drop off zone (marked by a solid yellow rectangle on Exhibits A and B of the United States' Complaint and comprising a grid of 5-by-7 concrete sidewalk slabs, approximately 15 feet from south to north (extending from EMW's property line to the patient drop zone), by approximately 7.5 feet from east to west (extending to and from columns supporting an overhang to EMW's entrance)) during EMW's hours of operation and the time periods both two hours before its opening and after its closing.  This Court should also prohibit Defendants from entering onto EMW property, identified by the solid white line on the pavement in front of EMW abutting the sidewalk running east and west along West Market Street (see Exhibit B to the United States' Complaint).

I.      **STATEMENT OF FACTS**

      A.      **EMW is a Reproductive Health Services Facility.**

EMW operates one reproductive health center in the Louisville, Kentucky metropolitan area, which is the only reproductive health services facility that provides abortion procedures in Kentucky.  *See* Attached Exhibit C, Affidavit of Special Agent Paul Sparke, at ¶ 5.  EMW staff conduct client consultations on Mondays and perform abortions from Tuesday through Saturday of each week.  *Id.* at ¶ 6.  All surgical procedures are scheduled for 8:00 a.m.  Protestors are almost always present outside EMW and typically number from twelve to 100 people.  *Id.* at ¶ 7.

      B.      **Defendant Thomas is Director of OSA, an Organization with a History of Organizing Events to Block Access to Reproductive Health Facilities, and under his Leadership the Organization Recently Reinstituted the Practice.**

Defendant Rusty Thomas has been the director of OSA since 2014.  *See* Attached Exh. C at ¶ 19. OSA is a non-profit corporation in Florida, with the stated purpose of "defending the lives of humans from the pre-born through natural death and their civil rights as secured by law, both human and Divine."  *See* Attached Exh. C at ¶ 9.  OSA is responsible for disruptive protests targeting reproductive health care providers, schools, and churches, as well as the private residences of reproductive health care staff and physicians.  *Id.* at ¶ 10.

Congress implemented the FACE Act in 1994 in response to organized blockades of reproductive health facility entrances and harassment of doctors, workers, and women seeking abortions.  *See* Attached Exh. C at ¶ 12.  For example, in 1991, Operation Rescue's protests resulted in nearly 2,700 arrests as demonstrators blocked access to reproductive health facilities.  *Id.* at ¶ 13.  Among other activities, Operation Rescue and others organized what they called "Rescues:" physical blockades of particular reproductive health services facilities intended to

disrupt and eventually end the facilities' operations.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270, 113 S. Ct. 753, 759–60, 122 L. Ed. 2d 34 (1993) (citing District Court finding that "Rescues" are defined as physical intervention between abortion providers and patients); *NOW v. Operation Rescue*, 747 F. Supp. 760, 763-64 (D.D.C. 1990) (quoting Operation Rescue literature defining "Rescues" as "physically blockading abortion mills with [human] bodies, to intervene between abortionists and the innocent victims").

In November 2016, OSA director Rusty Thomas began speaking publicly about the need to return to OSA's "Rescue" movement of the past where people "interposed" by "putting their bodies between the victim and their oppressor" to block access to abortion facilities.  *See* Attached Exh. C at ¶ 15.

Then, on May 13, 2017, Thomas led the other Defendants onto EMW's property, where they sat down and physically blocked patient and provider access to the sole public entrance of the facility, in violation of the FACE Act, described more fully below.  *Id.* at ¶ 18.

Thomas refers to the May 13 arrests at EMW as examples of the "doctrine of interposition"—a guideline to disregarding the law by placing your body where it is legally prohibited.  *See* Attached Exh. C at ¶ 23.  Thomas further states that other OSA associates are prepared to "cross similar lines to the point of jail."  *Id.* at ¶ 23.  In conclusion, he said, "Let us . . . continue to advance the doctrines of interposition . . . cross the line again and Rescue . . . ."  *Id.* ¶ 23.

Thomas has personally been sued for violating the FACE Act and entered into a Consent Decree to resolve the matter.  *See* Attached Exh. C at ¶ 24.

### C.  Defendants Soderna an Edl Have a History of Violating the FACE Act.

        **1.**      **Soderna has been convicted of violating the FACE Act and has a civil judgment against him for violating the FACE Act.**

Defendant James Soderna has a prior conviction for violating the FACE Act.  *See* Attached Exh. C at ¶ 25.  He has been personally sued for violating the FACE Act in Wisconsin and is permanently enjoined from rendering impassable ingress to or egress from the facility at issue or rendering passage to or from the facility unreasonably difficult or hazardous.  *Id.* at ¶ 26. He has also been personally sued in New Jersey for violating the FACE Act and, on December 11, 1998, the court issued a judgment against Soderna.  *Id.* at ¶ 28.

Wisconsin and Milwaukee also brought action against 32 protesters, including Soderna, for blocking, intimidating, and harassing women and medical personnel lawfully utilizing reproductive health facilities.  *Id.* at ¶ 27. The court issued a judgment against Soderna.  *Id.*

        **2.**      **Edl has a civil judgment against her for violating the FACE Act.**

Defendant Eva Edl has a prior judgment against her for violating the FACE Act.  *See* Attached Exh. C at ¶ 29.

        **3.**      **Keys, Green, Raddell, Graves, Buck, James Zastrow, and Eva Zastrow have no prior FACE Act violations.**

The remaining Defendants have no prior criminal convictions for violating the FACE Act and have not been sued civilly for violating the FACE Act.  *See* Attached Exh. C at ¶ 30.

### D.  On May 13, 2017, Defendants Blocked Patient and Provider Access to EMW.

On May 13, 2017, OSA members from around the country congregated in Louisville, Kentucky to protest and block patient access to EMW.  *See* Attached Exh. C at ¶ 31.  By 5:45 a.m., protesters had already set up signs and an amplified sound system in front of EMW.  *Id.* ¶ at 31.  By 6:00 a.m., an estimated 50 protesters had gathered in front of EMW.  *Id.* at ¶ 31.

Louisville Metro Police Department ("LMPD") arrived at 6:45 a.m., and an estimated 100 people were gathered on public property by EMW's doors at that time.  *Id.* at ¶ 32.

LMPD assigned its Special Response Team to manage crowd issues, prevent violence and property damage, and maintain safety.  *See* Attached Exh. C at ¶ 38.  Lieutenant R. Shawn Hensler served as the on-scene commander of this special detail, overseeing ten other officers. *Id.* at ¶ 38.

EMW opened at approximately 8:00 a.m. that morning, which was about the time the first patient approached the building.  *See* Attached Exh. C at ¶ 32. At this time, Defendant Rusty Thomas was standing in front of the white line delineating EMW's private property, and the other nine individual Defendants and a minor were in line behind him.  *Id.* at ¶ 33.  Local OSA leader Joseph Spurgeon was directly in front of the line of Defendants, filming them.  *Id.* at ¶ 33. Thomas said, "Your church taught us to stand in the gap, to make up the hedge."  *Id.* at ¶ 34. Upon receiving a previously determined cue, Thomas, the director of OSA, led the Defendants' group in a line onto EMW property.  *Id.* at ¶ 35. The Defendants then violated the FACE Act by sitting down in rows with their backs against EMW's doors, behind the white line delineating EMW's private property, with their hands in their laps, and refusing to move.  *Id.*  The Defendants were led by OSA Director Thomas, and included Soderna, Raddell, Graves, Buck, Keys, James Zastrow, Edl, Eva Zastrow, Green, and a minor.  *Id.* at ¶ 36.

One OSA member live-streaming the event on Facebook then said, "They've crossed the line.  They've crossed the line and are shutting down this mill right now."  *See* Attached Exh. C at ¶ 37.

LMPD officers estimated an additional 40 OSA demonstrators rushed the entrance of EMW at this time and surrounded the 11 people blocking EMW's doors.  *See* Attached Exh. C at

¶ 38. The rush of OSA protestors towards EMW's front doors caused conflict between the protestors and the escorts.  *Id.* at ¶ 38.

Patients could not access EMW at this time because Defendants were sitting in front of EMW's doors and would not move for the doors to open.  *Id.* at ¶ 38.  EMW volunteers escorted three patients to the rear of the facility, where they entered through a staff-only entrance.  *Id.* at ¶ 38.  A fourth patient was not immediately identified as such by escorts, and so remained in the crowd awaiting entry.  *Id.* at ¶ 38.  The fourth patient entered after LMPD arrested Defendants and access to EMW's public entrance was restored.  *Id.* at ¶ 38.

When OSA protesters moved en masse towards the EMW entrance, LMPD officers converged on the facility entrance to restore order and remove trespassers.  *Id.* at ¶ 38.  Lt. Hensler approached Defendants and informed the whole group that they would be arrested if they did not leave on their own.  *Id.* at ¶ 38.  One officer said, "you guys understand you are going to be arrested.  If you are willing to leave, you will not be arrested."  *Id.* at ¶ 39.

An escort spoke to EMW staff through the barely-ajar door then asked the LMPD officers to move the demonstrators who were sitting on the ground in front of the entrance from EMW's property.  *Id.* at ¶ 40.  Lt. Hensler approached the group's leader, Defendant Rusty Thomas, and asked him if he would direct his members to move.  *Id.* at ¶ 41.  Lt. Hensler decided to arrest Defendants and charge them each with trespassing.  *Id.* at ¶ 42.  As various officers worked to remove Defendants, LMPD gave each Defendant individually a final opportunity to leave on his or her own and warned that non-compliance would result in arrest.  *Id.*  None of Defendants voluntarily left the premises and LMPD placed all of them under arrest and charged them with trespassing.  *Id.*  LMPD also charged James Soderna with Resisting Arrest, III, because he went limp and refused to walk or be led away from the facility, forcing officers to drag him.  *Id.*

The event was live streamed on Facebook, and a previously recorded press release entitled "Vision and Mission of the Louisville Rescue" was posted to Facebook during the Defendants' obstruction of EMW's entrance.  *See* Attached Exh. C at ¶ 43.  In that video, OSA director Thomas explained, "Right now, an historic event is in progress.  A small band of committed Christians with Operation Save America are crossing a line that hasn't been crossed in nearly twenty years.  There are no other ministries or organization sponsoring this event."  *Id.*  "These rescuers are exercising the Christian Doctrine of Interposition."  *Id.*

### E.    OSA is Holding its National Event in Louisville, Kentucky from July 22-29, 2017

OSA is planning to hold its National event in Louisville, Kentucky from July 22-29, 2017.  *See* Attached Exh. C at ¶ 44.   Approximately 1,000 members of OSA are expected to attend.  *Id.* at ¶ 45.  Defendant Thomas, in his individual capacity and in his capacity as director of OSA, is using Facebook, Instagram, YouTube, Twitter, blogs, www.operationsave america.org, radio, news reports, and other public forums to encourage OSA representatives, agents, employees, and others acting in concert or participation with Defendant Thomas to violate the FACE Act by physically obstructing EMW during the OSA national event.  *Id.* at ¶ 51-56.

The heading on the home page of OSA's website is titled "Louisville Rescue."  *See* Attached Exh. C at ¶ 47. Therein, OSA has collected videos of the May 13, 2017 event, articles glorifying the May 13 event, articles encouraging OSA associates to Rescue, and information promoting their national event in Louisville (where OSA associates engaged in "Rescue" on May 13).  *Id.* at ¶ 47.  One article encouraging OSA associates to engage in further "Rescues" addresses associates' concerns with violating the law and argues, "When the States commands us

to do what God forbids or forbids us to do what God commands – we are to obey God rather than

man." *Id.* at ¶ 48.  Another article explains the history of "Rescue," stating,

> [I]t was believed that if enough Christians joined the sit-ins, a critical mass would
> rise that would elect leaders to replace judges who would overturn *Roe v. Wade*
> and the federal government would protect the preborn nationwide[ but the] FACE
> Act made rescue and interposition too costly. . . [and ultimately failed] because
> we gave up.

*Id.* at ¶ 49.  The article then calls OSA associates to renew "Rescues," because "failing then is

not an excuse for surrendering without a fight now."  *Id.* at ¶ 49.  A final article advocating OSA

associates to engage in "Rescues" states, "[t]he Freedom of Access to Clinic Entrances is no law

at all since FACE seeks to protect and institutionalize the murder of preborn babies (in violation

of God's law and the U.S. Constitution) and is itself built on the fiction of *Roe v. Wade*, it should

be challenged."  *Id.* at ¶ 50.

On May 20, 2017, OSA posted to Instagram and Rusty Thomas shared the image on

Facebook, "[w]hy block abortion clinic doors?  Babies are being murdered behind those doors."

*Id.* at ¶ 51.  On May 23, 2017, Cal Zastrow, an OSA member and father of the two Zastrow

defendants, posted to Facebook, "Both Eva [Zastrow and Eva Edl] were successful in Rescuing

babies in Louisville together on May 13th.  They peacefully interposed between the murderers

and the innocent children. . . . If just one person from each local church in America would

Rescue, surgical baby-murdering would end in a week, with chemical murdering soon to

follow."  *Id.* at ¶ 52.  Also on May 23, 2017, OSA's local leader, Joseph Spurgeon, posted an

advertisement for the National event in July to Facebook, and stated, "On May 13, 2017, 11

faithful Christians interposed themselves between those helpless victims and those who would

seek to do them harm. . . . May this witness awaken the church."  *Id.* at ¶ 53.  On June 12, 2017,

he posted to Facebook, "Some men see the enemy and strip down for warfare.  Other men see the

enemy and turn their backs on him to sing lullabies to their troops who are even more scared to death than their officers." *Id.* at ¶ 54. OSA member Cal Zastrow, responded, "Some men (and teenage girls) see people murdering children, and they go Rescue, they sacrifice themselves." *Id.* at ¶ 54.

## II.   **LEGAL ARGUMENT**

### A.   **Standard for Temporary Restraining Order and Preliminary Injunction**

In FACE Act litigation by the Attorney General of the United States, the Court may award relief including temporary, preliminary, or permanent injunctive relief, compensatory damages to persons aggrieved, and/or civil penalties. *See* 18 U.S.C. § 248(c)(2)(A)-(B). The standard for issuing a temporary restraining order (TRO) is the same as for the issuance of a preliminary injunction. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). In determining whether to issue a preliminary injunction or temporary restraining order, the Court must evaluate four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether irreparable injury would result if the TRO or preliminary injunction does not issue; (3) whether issuance of a TRO or preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the sought after injunctive relief. *Summit County Democratic Cent. and Exec. Comm. v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004); *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir.1997); *McPherson v. Michigan High Sch. Ath. Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997). These factors are not "rigid and unbending requirements," as there is no "fixed legal standard" in determining whether to issue an injunction. *In re: Eagle–Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir.1992); *Odom v. Pheral*, 2012 WL 3717979 (W.D. Ky. 2012). However, in making its determination the "district court is required to make specific

findings concerning each of the four factors, unless fewer factors are dispositive of the issue."

*Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir.1997).  As set

forth below, the United States has satisfied all the elements necessary for the issuance of a

preliminary injunction and a temporary restraining order.  Further, because of the emergent

nature of the United States' request, and because the United States has made extensive attempts

to provide Defendants with actual notice, a temporary restraining order should issue regardless of

whether the Defendants receive actual notice prior to issuance.

### B.     The United States Has Satisfied the Standard for Obtaining Preliminary Injunctive Relief and a Temporary Restraining Order

#### 1.      The United States has a strong likelihood of success on the merits.

Defendants' physical obstruction of the entrance to EMW on May 13, 2017, clearly

constitutes a violation of the FACE Act.  Whoever: 1) by force, threat of force, or physical

obstruction; 2) intentionally injures, intimidates, or interferes with, or attempts to injure,

intimidate, or interfere with; 3) any person because that person is, or in order to intimidate such

person from, providing or obtaining reproductive health services, violates the FACE Act and

may be subject to civil and criminal penalties.  18 U.S.C. § 248(a)(1).  The FACE Act defines

"physical obstruction" as "rendering impassable ingress to or egress from a facility that provides

reproductive health services . . . or rendering passage to or from such a facility . . . unreasonably

difficult or hazardous." 18 U.S.C. § 248(e).  The statute further defines "interfere with" as "to

restrict a person's freedom of movement." *Id.*

Sitting in front of a doorway to block access to a facility has regularly been found to be

an obstruction and a violation of the FACE Act.  *See U.S. v. Lynch and Moscinski*, No. 95 Civ.

9223 (JES) (S.D.N.Y Feb. 26, 1996) (issuing permanent injunction), *acq.* No. 96 Cr. Misc. 1,

952 F. Supp. 167, *appeal dismissed* 162 F.3d 732 (2d. Cir. 1998) (upholding lower court's

acquittal of criminal contempt), *reh'g en banc denied* 181 F.3d 330 (2d Cir. July 14, 1999); *see also U.S. v. Menchacham*, No. 96 Civ. 5305 (SS) (S.D.N.Y.); *U.S. v. Roach*, No. 96-5341 (E.D. Pa.); *U.S. v. Gregg*, 32 F. Supp. 2d 151 (D.N.J. 1998), *aff'd* 226 F.3d 253 (3d Cir. 2000) (affirming district court's award of joint and several statutory damages and finding that FACE is constitutional); *U.S. v. Alaw*, No. 98-1446 (D.D.C. Jan. 21, 2000). Physical obstruction of an entrance or exit to a reproductive health services facility "need not be permanent or entirely successful" to violate FACE if it makes passage to or from the facility unreasonably difficult. *New York v. Cain*, 418 F.Supp.2d 457, 480 n.18 (S.D.N.Y. 2006). Therefore, the fact "[t]hat patients may eventually have reached the [facility] in spite of defendants' actions is . . . beside the point." *Id.*; *see also Gregg*, 32 F.Supp.2d at 156 ("[A]s long as access is made 'unreasonably difficult or hazardous,' it is not necessary to establish that there was absolutely no way to enter an abortion facility in order to prove a violation of the Act."). "Physical obstruction" is not limited "to bodily obstruction, but rather is broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult." *U.S. v. Mahoney*, 247 F.3d 279, 284 (D.C. Cir. 2001).

Video footage and photographs from numerous angles, witness accounts, and in several cases Defendants' own admissions, all demonstrate that Defendants physically obstructed the only patient entrance to and exit from EMW on May 13, until law enforcement officers were forced to arrest them. As described above, Defendants waited near the entrance of EMW until the facility opened, at which time they sat in several rows directly in front of the doors, on EMW property. Persons inside EMW had to use a volunteer outside as an intermediary to communicate with LMPD officers outside because Defendants made ingress and egress via the patient entrance impossible. Defendants succeeded in completely obstructing access to EMW altogether in the case of at least one patient, for a period of time. Defendants made entry to

EMW unreasonably difficult for at least three other patients who could not enter through the public entrance and had to be escorted through the EMW employee parking lot and through an EMW staff entrance to the facility.

Video and photographic evidence also show that Defendants intended to interfere with, or restrict the movement of, patients because they were attempting to access EMW as well as the staff and others inside EMW because they were providing services.  Defendants walked in formation, from the public sidewalk across a line painted on the cement identifying EMW property, and sat in rows directly in front of the facility's front doors.  Defendants' coordinated movement en masse shows that they intended to block entry and exit from the building. Moreover, Defendants refused to leave even after advised by LMPD Lieutenant Hensler and another officer that they would be arrested.  That is, Defendants chose to continue blocking entry to and exit from EMW, even after police advised them they were breaking the law by doing so. Moreover, Defendants timed their blockade for the moment EMW opened and the first patients were about to enter, leaving the patients outside the entrance to EMW.  This shows that Defendants undertook their actions to interfere with persons because they sought to obtain or provide reproductive health care services.

Defendant Rusty Thomas set the stage for Defendants' physical obstruction of patients seeking EMW services when Thomas, in November 2016, called for a return to OSA's "Rescue" movement of OSA's past.  Thomas called for a return to OSA's pattern of physically obstructing access to reproductive health services facilities, or "interposing" by "putting their bodies between the victim and their oppressor."  Defendant Rusty Thomas has publicly defended the May 13 EMW obstruction as Defendants "peaceably plac[ing] their bodies between the abortionist's knife and the innocent children scheduled to be murdered for blood money,"

demonstrating that Thomas, who led the obstruction of EMW, intended to interfere with individuals because they were seeking and/or providing reproductive health services.  Similarly, Defendant Thomas has recently used social media to defend "block[ing] abortion clinic doors" generally because, he argues, "[b]abies are being murdered behind those doors."  Other OSA members have defended the May 13 physical obstruction and encouraged disregarding FACE.

Defendants Soderna and Edl have violated FACE in the past; their actions on May 13 at EMW therefore were part of a *modus operandi* of interfering with access to reproductive health services.  These Defendants' actions on May 13 fit into a larger plan to disrupt access to reproductive health services and thus cannot be dismissed as unintentional.

Although Defendants clearly intended to interfere with persons because they were providing or obtaining reproductive health services, a FACE violation only requires that Defendants intended to take the physical actions they did and knew the consequences that would likely flow from them.  *See Gregg*, 32 F.Supp.2d at 156-57 ("For purposes of FACE, 'intent' means 'intending to perform the act and aware of the natural and probable consequences of it.'").  Defendants here moved in formation to sit in front of EMW's doors just as the facility was opening.  Defendants clearly intended to sit in front of EMW's doors, and they knew that they would interfere with patients seeking services and providers seeking to provide them.

Note that, while Defendants may also have intended to communicate a message, that does not alter the analysis here.  In *N.Y. v. Operation Rescue Nat'l*, the court found it unpersuasive that "the protestors' purpose may have been to communicate their views" because "their activities *had the effect* of obstructing access to the facilities and making egress and ingress unreasonably difficult for patients."  273 F.3d 184, 194 (2d Cir. 2001) (emphasis added).

-14-

2.     **Reproductive health services staff and patients are being, have been, and will be irreparably harmed by the Defendants' FACE violations, and irreparable harm to public safety would result, unless the Court issues a temporary restraining order.**

Since the United States has shown a likelihood of success on the merits, and Defendants are reasonably likely to violate FACE in the future, this Court should presume irreparable harm.

> Because FACE authorizes this court to award preliminary injunctive relief when there exists a reasonable belief that the statute is being violated and when there is a reasonable likelihood of future violations, it will be presumed that Plaintiff will suffer irreparable harm if a preliminary injunction is not issued. [Under such circumstances], the second element is satisfied.

*U.S. v. Roach*, 947 F. Supp. 872, 877 (E.D. Pa. 1996).  In this case, Defendants clearly violated the FACE Act on May 13.  *See supra* Part II.B.1.  Defendant Thomas and other OSA members are advocating future blockades of EMW, making future FACE violations reasonably likely.  In November 2016, Defendant Thomas called for a return to OSA's serial obstruction of access to reproductive health services, and OSA has since used social media to decry the "status quo" of mere verbal demonstrations in opposition to abortion.  Most critically, OSA has scheduled its National event for July 22-29, 2017 in Louisville, and OSA's advertisements for this upcoming event exalt the unlawful May 13 blockade of EMW. Even in the absence of any presumption, the facts show that Defendants' conduct is likely to cause irreparable harm.  Courts have found that "women denied access [to medical facilities] cannot be compensated by money damages; injunctive relief alone can assure them the clinics' availability." *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989).  Patients have the freedom to seek pregnancy-related services, including "unimpeded access to [a] clinic by way of public streets and sidewalks."  *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 372-373 (1997) (*quoting Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768 (1994)); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (June 26, 2014).  Thus, impeded access to EMW is tantamount to

"a reduction in health care benefits," which the Sixth Circuit Court of Appeals holds "can cause irreparable harm" for purposes of a preliminary injunction. *See City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 432 (6th Cir. 2014).

Here, the Defendants have interfered with patients and staff obtaining and/or providing, or attempting to obtain and/or provide, reproductive health services, and several Defendants intend, by obstruction, to prevent services from being provided altogether in Kentucky.  As described above, Defendants physically obstructed access to the only patient entrance to and exit from EMW on May 13, until they were arrested.  Defendants' conduct prevented at least one patient, for a period of time, from entering EMW.  Defendants also made entry to EMW unreasonably difficult for at least three other patients who could not enter through the public entrance and had to be escorted through an EMW staff entrance to the facility.  Defendants denied patients access to a reproductive health services facility, and this cannot be compensated by money damages.  *See Terry*, 886 F.2d at 1362.

Further harm is reasonably certain to occur.  As described above, the actions and statements of Defendant Thomas, and those of other OSA members, threaten continuing violations of FACE and make it reasonably likely that Defendants will interfere with more patients seeking access to reproductive health services at EMW, causing further irreparable harm.

Defendants' conduct presents a second type of harm: their continuous protests and proclamations have unduly taxed local law enforcement resources and present a public safety risk.  The United States has an interest in protecting and promoting public safety, including through enforcement of FACE.  *See* Pub. L. 103–259, § 2, May 26, 1994, 108 Stat. 694 ("[I]t is the purpose of [the FACE Act] to [, *inter alia*,] protect and promote the public safety… by

establishing Federal criminal penalties and civil remedies for certain violent, threatening, obstructive and destructive conduct that is intended to injure, intimidate or interfere with persons seeking to obtain or provide reproductive health services."). Defendants' May 13 blockade and the rush of 40 OSA protesters towards the EMW facility front doors caused conflict with others present. Fortunately, LMPD had staffed the event with ten specialized tactical officers. LMPD officers converged on the scene, arrested Defendants, and with the help of nearby back-up units, restored order. Unfortunately, Defendants' conduct drew specialized law enforcement resources away from other critical public safety tasks.

The threat to public safety Defendants' protests present is reasonably likely to lead to irreparable harm. Only eleven protesters blockaded EMW's entrance on May 13, and still LMPD had to mobilize ten specialized officers to make the necessary arrests and control the surrounding crowd. Up to 1,000 OSA members are expected to attend its upcoming National event. Defendant Thomas and OSA's celebrations of the May 13 blockade in its National event advertisements are encouraging members to block access to EMW's entrance when they attend in July. Through his call for as many as 1,000 members to blockade EMW at the July National event, Defendant Thomas has made it reasonably likely that local law enforcement will have to deploy dozens if not a hundred officers to abate a massive unlawful blockade. This diverts officers from their ordinary duties of maintaining public safety in Louisville. Drawing massive numbers of law enforcement officers away from other public safety duties to maintain order for such an unlawful protest could impose incalculable costs to public safety, for which the people of Louisville surely could not be compensable by monetary damages.

The absence of a temporary restraining order would increase the risk that Defendants and those working with them follow through on their obstruction of EMW in July, taxing local law

enforcement resources and presenting the aforementioned undue risks to public safety.  Should a TRO issue, LMPD could enforce an existing Court Order restricting  Defendants and those acting in concert or participation with them to clear boundaries, rather than making difficult and dangerous split-second judgments about which protesters are violating criminal laws. The denial of this temporary restraining order would likely result in Defendants' interference continuing and potentially greater physical harm to more patients and staff during upcoming events.  Such injuries are both highly likely and unable to be compensated fully with money damages.

Plainly stated, as long as Defendants' conduct is allowed to continue unfettered, EMW patients and providers and others remain at risk of irreparable harm.  This is particularly true in the wake of planned protests in Louisville from July 22-29, 2017, during which OSA has expressed the intent to further violate the FACE Act.  *See* Attached Exh. C at ¶ 44, 47-56.

### 3.   Granting injunctive relief will not result in any substantial harm to Defendants or any third party.

Any harm to Defendants that would result if this Court issues a temporary restraining order would be minimal.  A temporary restraining order will not prohibit Defendants from exercising their First Amendment rights to free expression.  The proposed buffer zone into which this Court would restrict defendants from passing only covers an area of approximately 15 feet by 7.5 feet of the public sidewalk.  This form of relief will restrict the Defendants' access to a "public way" and "sidewalk," which is traditionally open for speech activities.  *See Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).  However, the proposed area is so small that the Defendants will easily remain able to communicate directly with patients and providers accessing EMW's entrance, including handing out leaflets and holding personal, consensual conversations with passersby.  The United States recognizes the First Amendment protections for these forms of speech, *see Coakley*, 134 S. Ct. at 2536-2537, and the buffer zone will not

-18-

prohibit Defendants form engaging in them; Defendants just will not be able to block access to EMW.  Furthermore, the conduct that the United States seeks to enjoin—namely physical obstruction of EMW—constitutes a FACE Act violation and is not legally protected.

A buffer zone is an appropriate remedy for a FACE Act violation where the requested relief "burdens no more speech than necessary to serve a significant government interest," *Madsen v. Women's Health Center*, 512 U.S. 753, 765 (1994), and "is narrowly tailored to the evidence presented." *U.S. v. McMillan*, 946 F. Supp. 1254, 1269 (S.D. Miss. 1995).  Indeed, courts have upheld permanent buffer zones of 25 feet or greater in the past.  *Madsen*, 512 U.S. 753 (36-foot buffer zone around reproductive health care facility entrance and driveway); *McMillan*, 946 F. Supp. 1254 (25-foot buffer zone around reproductive health care facility property) (In a contempt proceeding, this buffer zone has since been increased to 50 feet.  *U.S. v. McMillan*, 3:95-cv-633, Order, April 29, 2008).  The U.S. Supreme Court has also recognized that these types of injunctions protect the government's "strong interest in ensuring the public safety and order," which includes "promoting the free flow of traffic on public streets and sidewalks." *Madsen*, 512 U.S. at 768; *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 375 (1997).

In this case, the proposed "buffer zone" is far more limited than those approved in the cases cited above.  Instead of requiring Defendants to remain a distance of 25 or 50 feet from facility property, as injunctions issued by some courts have required, Defendants here would still be permitted right up to EMW property, and must only remain 3.5 feet to the east or west of the area leading to the EMW entrance.  The Supreme Court has upheld the portion of a buffer zone totaling 6,624 square feet, *see Madsen*, 512 U.S. at 770 ("the 36-foot [deep by 184-foot long] buffer zone around the clinic entrances and driveway burdens no more speech than necessary to

accomplish the governmental interest at stake"); the proposed buffer zone here only covers an area of approximately 112.5 square feet of public sidewalk, directly in front of the EMW entrance that Defendants blocked on May 13, or less than two percent the size of the buffer zone upheld in *Madsen*. "Even in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotations and citations omitted). Should this Court issue the proposed restraining order, Defendants can continue their free expression unabated, without blocking the entrance to EMW, but in immediate proximity to anyone using the sidewalk in front of EMW, including those providing or obtaining reproductive health services. The fact that the temporary restraining order would force Defendants to position themselves a few feet to the left or right of the EMW entrance, leaving access unobstructed, does not substantially harm Defendants' First Amendment rights.

Prohibiting Defendants from entering onto EMW property would simply prevent them from obstructing access to EMW, as they did on EMW property on May 13. It would not restrict their freedom of expression in a public space.

The requested injunctive relief will not affect, much less substantially harm, third parties. A targeted injunction like that sought here was favored by the Supreme Court in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014). There, the Court "noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures." *McCullen*, 134 S. Ct. at 2538. "Such an injunction 'regulates the activities, and perhaps the speech, of a group,' but only

'because of the group's past actions in the context of a specific dispute between real parties.'" *Id.* (adding emphasis and quoting *Madsen*, 512 U.S.753, 762 (1994)).  Importantly, "given the equitable nature of injunctive relief, courts can tailor a remedy to ensure that it restricts no more speech than necessary." *Id.* (citing *Madsen* 512 U.S. at 770; *Schenck v. Pro–Choice Network of W. N. Y.*, 519 U.S. 357, 380–381 (1997).  Indeed, this situation is unlike Massachusetts's legislation creating a 35-foot fixed buffer zone around all reproductive health facilities, which the Court found unconstitutional because it "burden[ed] substantially more speech than necessary to achieve the Commonwealth's asserted interests" of maintaining public safety on streets and sidewalks and in preserving access to the facilities.  *McCullen,*  134 S. Ct. at 2539. The injunctive relief sought here is narrowly tailored to a precise group of specifically-affiliated individuals, *i.e.*, OSA, and the precise conduct causing a particular problem, *i.e.*, blocking access to EMW's entrance.  As such, the requested equitable relief will not "categorically exclude non-exempt individuals from the buffer zone, unnecessarily sweeping in innocent individuals and their speech." *Id.*. at 2538.

### 4.    Injunctive relief against Defendants is in the public interest.

Reproductive health services are a matter of public interest and concern, and the public will best be served by the granting of a temporary restraining order and preliminary injunction in the instant matter.  A significant government interest lies in allowing unfettered access to health care facilities.  *See Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012) (stating that "[t]he public interest is promoted by the robust enforcement of constitutional rights"); *Planned Parenthood Sw. Ohio Region v. Hodges*, 138 F. Supp. 3d 948, 961 (S.D. Ohio 2015) ("The public interest in preserving the status quo and in

ensuring access to the constitutionally protected health care services while this case proceeds is strong.").

Moreover, some of the Defendants' behavior continues despite a number of civil judgments for FACE Act violations and one criminal conviction against them, as described above. The public comments made by OSA, Defendant Thomas and other OSA representatives explicitly demonstrate the intention to continue to flout the law and obstruct access to EMW, in particular. Accordingly, it is in the public interest to immediately invoke the Federal Court's authority to enforce the FACE Act to ensure that Defendants' unlawful activity at EMW does not continue. The requested temporary restraining order is plainly in the public interest.

### C.      A Temporary Restraining Order May Issue Without Notice

A court deciding whether to issue a temporary restraining order should be assured that the movant has produced compelling evidence of irreparable and imminent injury and that the movant has exhausted reasonable efforts to give the adverse party notice. *See Fuentes v. Shevin*, 407 U.S. 67 (1972); *Boddie v. Connecticut*, 401 U.S. 371 (1971); *Sniadach v. Family Finance Corp.*, 339 U.S. 337 (1969); 11 Wright & Miller, Federal Practice and Procedure § 2951, at 504–06 (1973) (and cases cited therein). The court may also consider other factors such as the likelihood of success on the merits, the harm to the non-moving party, and the public interest. 11 Wright & Miller at § 2951, at 507–08; *see also Eden Foods, Inc. v. Sebelius*, 2013 WL 1190001 *3 (E.D. Mich. 2013).

In this case, and consistent with Rule 65(b)(1)(B), the Government has certified its efforts to provide the Defendants with notice of its request for a temporary restraining order. The Government has contacted criminal defense counsel for individual Defendants and provided him with copies of these pleadings. The Government has also sent by FedEx overnight mail and

through certified mail a copy of all pleadings to the Defendants.  Finally, the Government will attempt to personally serve all Defendants located in Louisville, Kentucky, on July 19, 2017.  As demonstrated in the attached certification of undersigned counsel, Assistant United States Attorney Jessica R.C. Malloy, the United States has made good faith attempts to notify the Defendants of the instant motion.  (Certification of AUSA Jessica R.C. Malloy.)  The Government's efforts to provide notice to the Defendants is consistent with Rule 65(b), which was amended to "make it plain that informal notice, which may be communicated to the attorney rather than the adverse party, is to be preferred to no notice at all."  1966 Advisory Committee Note to 65(b).

Additionally, the United States has demonstrated through its statement of the relevant facts and supporting evidence in Attached Exh. C, that due to the time-sensitive nature of its request and risk of irreparable harm, notice should not be required.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, this Court should issue a temporary restraining order and preliminary injunction, enjoining the Defendants and others acting in concert or participation with them from using physical obstruction to intentionally interfere with any person, or attempt to intentionally interfere with any person, because the person was or had been obtaining or providing reproductive health services at EMW; and from entering a "buffer zone" directly outside EMW's entrance, between EMW property and the curbside patient drop off zone (marked by a solid yellow rectangle on Exhibits A and B of the United States' Complaint and comprising a grid of 5-by-7 concrete sidewalk slabs, approximately 15 feet from south to north (extending from EMW's property line to the patient drop zone), by approximately 7.5 feet from east to west (extending to and from columns supporting an overhang to EMW's entrance))

during EMW's hours of operation and the time periods both two hours before EMW's opening

and after its closing.  This Court should also prohibit Defendants from entering onto EMW

property, identified by the solid white line on the pavement in front of EMW abutting the

sidewalk running east and west along West Market Street (see Exhibit B to the United States'

Complaint).

<table>
<tr><td></td><td>Respectfully Submitted,</td></tr>
</table>

|  |  |
|---|---|
| JOHN E. KUHN, JR. | T.E.  WHEELER, II |
| United States Attorney | Acting Assistant Attorney General |
| Western District of Kentucky | Civil Rights Division |
|  |  |
|  | STEVEN H. ROSENBAUM |
|  | Chief |
|  | Special Litigation Section |
|  |  |
| */s/ Jessica R. C. Malloy* | JULIE ABBATE |
| JESSICA R. C. MALLOY | Deputy Chief |
| BENJAMIN S. SCHECTER | Special Litigation Section |
| Assistant United States AttorneyS |  |
| Western District of Kentucky | BRIAN BUEHLER |
| 717 West Broadway | Trial Attorney |
| Louisville, KY 40202 | Special Litigation Section |
| Jessica.Malloy@usdoj.gov |  |
| Benjamin.Schecter@usdoj.gov |  |
| (502) 582-5811 |  |